UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATALE DIMAURO,                          :
     Plaintiff,                         :
                                        :
v.                                       :            No. 3:15cv1485 (DJS)
                                        :
NANCY A. BERRYHILL,[1]                    :
ACTING COMMISSIONER OF                   :
SOCIAL SECURITY,                         :
     Defendant.                         :

RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

     This is an administrative appeal following the denial of an application filed by the

plaintiff, Natale DiMauro ("DiMauro"), for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").[2] It is brought pursuant to 42 U.S.C. §§ 405 (g)

and 1383 (c)(3).

     DiMauro now moves for an order reversing the decision of the Commissioner of the

Social Security Administration ("Commissioner"). In the alternative, DiMauro seeks an order

remanding his case for a rehearing. The Commissioner, in turn, has moved for an order affirming

---

     [1]Nancy A. Berryhill is now the Acting Commissioner of Social Security and is therefore substituted for Carolyn W. Colvin as the defendant pursuant to Fed. R. Civ. P. 25(d).

     [2]Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929 *et seq*. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §404.967. If the Appeals Council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205 (g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405 (g).

her decision.

The issues presented are whether the ALJ: (1) properly weighed the medical opinion evidence; and (2) properly evaluated DiMauro's credibility with regard to his symptoms. For the following reasons, DiMauro's motion for an order reversing or remanding the Commissioner's decision is granted in part and denied in part, and the Commissioner's motion for an order affirming her decision is granted in part and denied in part.

FACTS[3]

DiMauro filed applications for DIB and SSI on November 30, 2013, and December 18, 2013, respectively, for an alleged disability that commenced on August 1, 2013. For purposes of DIB, DiMauro's date last insured ("DLI") is September 30, 2017.[4] His applications were denied both initially and upon reconsideration.

On April 9, 2015, DiMauro appeared with counsel for a hearing before an ALJ. On April 23, 2015, the ALJ issued a decision denying benefits. On August 26, 20156, the appeals council denied DiMauro's request for review of that decision, thereby making the ALJ's decision the final decision of the Commissioner. This appeal followed.

DiMauro, who was born in 1964, has a high school education. His relevant  past work experience was as a stucco setter helper and a tile setter. According to DiMauro, he had to stop working in August 2013 because of constant pain in his neck and back due to a pinched nerve.

---

[3]The facts are derived from the joint stipulation of facts filed by the parties, as well as from medical records, the transcript of the administrative hearing, and the decision of the ALJ.

[4]In order to be entitled to disability benefits, a plaintiff must "have enough social security earnings to be insured for disability, as described in § 404.130." 20 C.F.R. § 404.315 (a)(1).

Medical Evidence

Middlesex Orthopedic Surgeons

DiMauro was evaluated for lower back and neck pain by Janice Desi, P.A.-C (Certified Physician Assistant) on January 14, 2013. Although DiMauro indicated that he had intermittent neck pain, his principal complaint was lower back pain that radiated from his back down both of his legs into his feet along with numbness and tingling. DiMauro further indicated that increasing pain was affecting his ability to work. Lumbar radiculopathy[5] was diagnosed and Percocet was prescribed. He was also scheduled for an epidural steroid injection.

DiMauro was seen again by P.A. Desi on three occasions between April and June 2013. On April 5, 2013, he indicated that he had not gotten the epidural injection because his pain had improved. He also stated that he had increasing pain in his right elbow and had trouble lifting objects. He had numbness in his fingers and had been dropping things. At that time he was diagnosed with resolving lumbar radiculopathy, medial epicondylitis[6] right elbow, and ulnar neuropathy[7] right elbow. On May 2, 2013, he was seen for neck pain with limited mobility and

---

[5]Lumbar radiculopathy is defined as "[n]erve irritation caused by damage to the discs between the vertebrae." www.medicinenet.com/script/main/art.asp?articlekey=26093 (last visited March 17, 2017).

[6]"Medial epicondylitis, also known as golfer's elbow, . . . is characterized by pain from the elbow to the wrist on the inside (medial side) of the elbow. The pain is caused by damage to the tendons that bend the wrist toward the palm." http://www.hopkinsmedicine.org/healthlibrary/conditions/orthopaedic_disorders/medial_epicondylitis_golfers_and_baseball_elbow_85,P00928/ (last visited March 17ulnar neuropathyu, 2017).

[7]"Ulnar neuropathy, also known as cubital tunnel syndrome, puts pressure on the ulnar nerve each time the elbow is bent, reducing the supply of blood to the nerve. This causes damage to the nerve over time."

also for pain in his upper back. Cervical spine x-rays revealed mild degenerative disc disease and a straightening of the cervical curve. On June 28, 2013, DiMauro reported low back and right elbow pain and indicated that his right elbow pain worsened when he lifted heavy loads at work. At that visit P.A. Desi diagnosed lumbar radiculopathy and lateral epicondylitis[8] of the right elbow.

Dr. Bruce H. Moeckel ("Dr. Moeckel"), an orthopedic surgeon, saw DiMauro on July 26, 2013 for continued back and right elbow pain. At that time DiMauro reported having difficulties with day-to-day activities due to pain. Dr. Moeckel's physical examination found tenderness across the lower back, pain into the buttocks caused by a straight leg raise, tenderness over the lateral epicondyle, and pain with resisted wrist extension. Dr. Moeckel administered a cortisone shot in the right elbow. On August 23, 2013, DiMauro reported significant right elbow pain as well as pain on the inside of his right arm with numbness and tingling in his right hand. At that time, Dr. Moeckel diagnosed lumbar radiculopathy, lateral epicondylitis of the right elbow, and ulnar neuropathy involving the right elbow. Dr. Moeckel stated he was concerned about DiMauro's severe elbow and back symptoms and whether he could continue working.

On September 25, 2013, Dr. Moeckel completed a Summary Impairment Questionnaire concerning DiMauro. Dr. Moeckel indicated diagnoses of lumbar radiculopathy, lateral

---

http://www.acsneuro.com/conditions_and_treatments/peripheral_nerves_detail/ulnar_neuropathy (last visited March 17, 2017).

[8]Lateral epicondylitis, or tennis elbow, "is a condition in which there is inflammation of the tendons (tendonitis) attached to the outside, or lateral side, of the elbow at the bony prominence of the arm bone (humerus)." http://www.hopkinsmedicine.org/healthlibrary/conditions/adult/orthopaedic_disorders/lateral_epi condylitis_tennis_elbow_85,p00925/ (last visited March 17, 2017).

epicondylitis of the right elbow, and ulnar neuropathy. The clinical and laboratory findings cited by Dr. Moeckel in support of his diagnoses were tenderness across DiMauro's lower back, decreased range of motion, and increased pain with range of motion. DiMauro's primary symptoms were  listed as lower back pain, right elbow pain, and increased pain when attempting to lift heavy loads. Dr. Moeckel offered his opinion that DiMauro was able to sit less than one one hour and stand/walk less than one hour in an eight-hour workday. He further opined that it was medically necessary for Dimauro to elevate both of his legs to waist level at all times when seated, that DiMauro was incapable of lifting and/or carrying even five pounds, and that he had significant limitations that allowed only occasional use of his hands/fingers for fine manipulation. The doctor indicated that DiMauro was likely to be absent from work more than three times a month as a result of his impairments or treatments. According to Dr. Moeckel, DiMauro's limitations applied at least as far back as August 1, 2013.

Dr. Moeckel evalutated DiMauro again on October 4, 2013, at which time DiMauro indicated that his biggest problem was pain and stiffness in his neck. He also had pain in his lower back and trouble with day-to-day activities. Dr. Mockel ordered cervical and lumbar MRIs and continued Percocet at a higher dose. On November 7, 2013, DiMauro reported to Dr. Moeckel that he continued to have right elbow, neck, and back pain. On that occasion, a steroid injection was administered to his right elbow and prescribed medications were continued.

On December 27, 2013, the cervical and lumbar MRIs that had been ordered by Dr. Moeckel were performed. The results of the cervical spine MRI were interpreted as showing mild degenerative changes of the cervical spine and no abnormal signal in the cervical spinal cord. The results of the lumbar spine MRI were interpreted as showing stable mild degenerative

changes of the lumbar spine.

DiMauro was seen by Dr. Moeckel again on January 8, 2014, and February 5, 2014. Dr. Moeckel continued to feel that DiMauro was disabled. There were no changes made to prescribed medications. Findings based on the doctor's physical examination of DiMauro remained unchanged from previous visits. According to Dr. Moeckel's February 5, 2014 note, DiMauro was trying to arrange a cervical epidural steroid injection.

DiMauro saw P.A. Desi on March 6, 2014 for increased pain in his back and down both legs. He indicated that he had been clearing snow and experienced increased pain in his lower back and down both legs. He complained of trouble with day-to-day activities and was unable to lift anything. On March 26, 2014, an epidural steroid injection was administered to DiMauro.

On April 2, 2014, DiMauro reported to Dr. Moeckel that his back pain continued, although the epidural steroid injection gave him some relief. Dr. Moeckel referred DiMauro for a second lumbar injection which was administered on April 23, 2014. No significant changes were noted at subsequent follow-up visits through October 13, 2014.

Dr. Moeckel completed a second Summary Impairment Questionnaire on October 13, 2014. He indicated diagnoses of lumbar radiculopathy, cervical radiculopathy, and status post shoulder surgery[9]. Dr. Moeckel listed MRIs of the cervical and lumbar spines as the clinical findings that supported his diagnoses. DiMauro's primary symptoms were reported as neck and back pain. According to Dr. Moeckel, DiMauro was able to sit for up to two hours and stand/walk for no more than one hour in an eight- hour workday. He could occasionally lift

---

[9]In the Questionnaire, Dr. Moeckel reports that DiMauro had shoulder surgery at an earlier period of time. This prior surgery was not mentioned in Dr. Moeckel's first Questionnaire.

and/or carry up to five pounds, but never more than five pounds. He could only occasionally use his hands and fingers for fine manipulation. Dr. Moeckel further opined that DiMauro was likely to be absent from work more than three times per month due to his impairments or treatments.

On January 14, 2015, DiMauro reported that his neck and back pain had worsened. Physical examination revealed tenderness across the lower back, pain into his buttocks caused by a straight leg raise, and neck pain radiating into his shoulder blades caused by range of motion of his neck. At the same time, physical examination also revealed that "upper extremity motor strength is 5/5, sensation is intact [and] [r]eflexes are symmetric." (Doc. # 9-8, at 71, p. 435). [10]

On April 11, 2015, Dr. Moeckel completed a Disability Impairment Questionnaire in which he repeated the findings reported in his second Summary Impairment Questionnaire. Dr. Moeckel again listed MRIs of the cervical and lumbar spines, as well as an x-ray, as the clinical findings that supported his diagnoses of cervical radiculopathy and lumbar radiculopathy. He also opined that it was medically necessary for DiMauro to avoid continuous sitting in an eight-hour workday, and that if seated, he would need to get up and move around every 15-20 minutes for a period of 15-20 minutes before sitting again. DiMauro could occasionally lift and/or carry up to ten pounds but never more. He could frequently use his hands and fingers for fine manipulations, but could only occasionally grasp, turn, and twist objects. According to Dr. Mocekel, DiMauros's pain, fatigue, and other symptoms were frequently severe enough to interfere with his attention and concentration. He would need to take unscheduled rests at unpredictable intervals during an

---

[10]The designation "at 71" refers to the page number (indicated at the top of the page) assigned by the Court's electronic filing system within the cited document (in this instance, document 9-8). The designation "p. 435" refers to the page number (indicated at the bottom of the page) assigned within the administrative record filed by the Commissioner.

eight-hour workday for 10-15 minutes each time before returning to work. Dr. Moeckel estimated that DiMauro was likely to be absent from work two or three times per month as a result of his impairments or treatment.

Pranav Kapoor, M.D.

Dr. Pranav Kapoor ("Dr. Kapoor"), DiMauro's primary care physician, first saw DiMauro on December 10, 2013. At that time Dr. Kapoor diagnosed obesity, elevated blood pressure without diagnosis of hypertension, and gastroesophageal reflux disease ("GERD"). At a follow-up visit on January 20, 2014, Dr. Kapoor diagnosed hypertension and chronic back pain.

On January 24, 2014, Dr. Kapoor completed a Mental Impairment Questionnaire at the request of the Social Security Administration. He diagnosed a prior history of depression and listed medications that included Escitalopram, which is used to treat anxiety and major depressive disorder. DiMauro's mental status was reported as appropriate and normal. According to Dr. Kapoor, DiMauro had a slight problem using appropriate coping skills to meet the ordinary demands of a work environment, but had a serious problem performing work activity on a sustained basis due to his physical limitations from chronic pain.

On March 10, 2014, DiMauro reported to Dr. Kapoor that he had experienced a little dizziness and shortness of breath. DiMauro expressed his belief that these symptoms were "secondary to back pain when he was replacing parts on the ventilation unit above his range. He was twisted in an unusual position and when he stood up straight he began to feel symptoms and sharp pain." (Doc. # 9-8, at 51, p. 415). During the period from March 2014 through October 2014 DiMauro saw Dr. Kapoor on three occasions. During these visits DiMauro reported feeling anxious and depressed. He indicated that he had tried to go back to work but had to stop after

-8-

three weeks due to unbearable pain. Dr. Kapoor diagnosed hypertension, depression, chronic low

back pain, and being overweight. He prescribed medications that included antidepressants.

On February 13, 2015, Dr. Kapoor completed a Disability Impairment Questionnaire. He

indicated diagnoses of GERD, hypertension, depression, impaired fasting glucose (pre-diabetes),

and chronic low back pain. DiMauro's primary symptoms of depression were listed as poor sleep

and increased stress. According to Dr. Kapoor, DiMauro's symptoms and limitations applied as

far back as August 1, 2013. Dr. Kapoor stated that he only treated DiMauro for his blood

pressure and impaired fasting glucose and that another doctor treated him for his back pain.  He

also indicated that he had not assessed DiMauro's capacity for work.

In a report dated March 23, 2015, Dr. Kapoor stated that he believed chronic back pain

was the primary basis of DiMauro's disability. He reported that DiMauro's hypertension and

GERD were well controlled with medication. Dr. Kapoor also indicated that DiMauro's

depression had worsened lately and that his medication had been changed to a different anti-

depressant.

Patrick J. Russolillo, Ph.D.

Dr. Patrick Russolillo ("Dr. Russolillo"), a licensed psychologist, evaluated DiMauro on

March 4, 2014. DiMauro stated that he had no history of mental health issues, but began

experiencing stress three years earlier when he lost his job. At that time, his doctor prescribed an

anti-depressant. DiMauro descibed his problem as a "money depression," as well as pain and

stress. Dr. Russolillo diagnosed adjustment disorder with mixed anxiety and depressed mood-

chronic.

State Agency Physicians

Dr. Robert Mogul ("Dr. Mogul"), a state agency physician, reviewed DiMauro's claim

file in February 2014 and opined that DiMauro could occasionally lift 50 pounds and frequently

lift 25 pounds, stand and/or walk about six hours in an eight-hour workday, and sit for six hours

in an eight-hour workday. The specific facts upon which Dr. Mogul based his conclusions were

the 2013 MRIs of DiMauro's cervical and lumbar spine and Dr. Moeckel's treatment note

regarding DiMauro's visit on November 7, 2013. The February 11, 2014  disability determination

that included Dr. Mogul's opinions stated that "[t]here is no indication that there is medical or

other opinion evidence." (Doc. # 9-4, at 9, p. 99).

A second state agency physician, Dr. Khurshid Khan ("Dr. Khan"), reviewed DiMauro's

claim file in June 2014. The opinions and conclusions reached by Dr. Khan, as reflected in the

disability determination dated June 16, 2014, are a mirror image of those expressed by Dr. Mogul

in the February 11, 2014 disability determination. As was the case with Dr. Mogul, Dr. Khan

identified the specific facts upon which he based his conclusions as the 2013 MRIs of DiMauro's

cervical and lumbar spine and Dr. Moeckel's treatment note regarding DiMauro's visit on

November 7, 2013. Likewise, the June 16, 2014 disability determination states that "[t]here is no

indication that there is medical or other opinion evidence." (Doc. # 9-4, at 38, p. 128).

Hearing Testimony

At the April 9, 2015 hearing before the ALJ, DiMauro testified that he had to stop

working as a tile setter in August 2013 because of constant pain in his neck and back due to a

pinched nerve. He stated that he has shooting pain down both legs and into his toes. The pain in

his neck shoots down his left arm and numbs his fingers. He also has issues with pain around his

right elbow. He can only drive for about 15 minutes and then has to pull over and stretch due to back pain. He also testified that he had done some light work on a part-time basis in 2014.

Although back surgery has been discussed as a treatment option, DiMauro is afraid to have surgery, since his orthopedic surgeon told him there was only a 50% chance it would help. Physical therapy sessions have not helped him. He testified further that he cannot stand for any period of time because of back pain. Sitting hurts as well, but he can tolerate sitting for anywhere from 15 minutes to half an hour. He cannot lift much weight due to numbness in his fingers and grip weakness. He cannot bend, stoop, or crawl due to his back. On his worst days DiMauro walks with a cane, which helps take some of the pressure off his back.

DiMauro lives in a house with his wife and two children. During the day, he naps, watches television, walks around the house, and applies ice and heat to his neck and back. He does no cooking, cleaning, shopping, or yardwork. DiMauro has no hobbies or outside interests. One of his neighbors stops by almost every day to help with home repairs and take out the trash. During his testimony, DiMauro had to stand up and stretch.

A vocational expert ("VE") also testified at the hearing. According to the VE, a hypothetical individual of DiMauro's age, education, and work background, who was limited to work at the light exertional level and who could occasionally balance, stoop, kneel, crouch and crawl, but must avoid climbing ladders, ropes, and scaffolds and exposure to hazards such as open moving machinery and vibration, and who could engage in frequent reaching with the right extremity and frequent fingering and handling bilaterally could not perform DiMauro's past work. Such an individual could perform work as an office cleaner, a price marker, and a cafeteria attendant. If that person was further limited to only occasional reaching with the right dominant

upper extremity, that person would not be able to perform the three jobs mentioned above, but could perform the jobs of a parking lot attendant, a self-service gas station attendant, and a greeter.

The VE also testified that if an individual was: (1) off task 15% of the time, (2) absent from work two times a month, or (3) limited to only lifting and carrying up to five pounds occasionally and sitting for a total of only two hours in and eight-hour workday and standing and/or walking less than one hour in an eight-hour workday, that individual could not perform any work.

The ALJ's Decision

In his April 23, 2015 decision, the ALJ found that DiMauro had not engaged in substantial gainful activity since the alleged onset date of August 1, 2013, and had the following severe impairments: degenerative disc disease and peripheral neuropathy/epicondylitis. He also found, however, that DiMauro did not have an impairment that met or equaled the severity requirements of an impairment listed in the pertinent regulations. The ALJ further determined that DiMauro had the residual functional capacity to perform light work with specified limitations and that there were jobs that exist in significant numbers in the national economy that he could perform. Consequently, the ALJ concluded that DiMauro was not disabled for purposes of the Social Security Act.

In reaching his decision, the ALJ afforded little weight to the opinions of Dr. Moeckel. The ALJ found Dr. Moeckel's opinions to be "not supported with explanation," "not consistent with the record as a whole," or "vague and conclusory." (Doc. # 9-3, at 33, p. 32). The ALJ gave "great weight . . .  to the June 16, 2014 opinion of Khurshid Kahn [sic], M.D., a Disability

Determination Services medical consultant, who opined that the claimant could do a range of medium work within 12 months of onset." (Doc. # 9-3, at 34, p. 33). The ALJ went on to note that while DiMauro may not have improved to the extent expected by Dr. Khan, DiMauro's "residual functional capacity has been reduced to light [work] to account for the claimant's slower than anticipated improvement." (*Id.*).

## STANDARD

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205 (g) of the Social Security Act, 42 U.S.C. § 405 (g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405 (g). Accordingly, the court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Secretary of Health and Human Services*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching her conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence and not affected by legal error, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined "substantial evidence" as "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record." *Williams*, 859 F.2d at 258.

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423 (a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423 (d)(1). In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[11]

In order to be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423 (d)(2)(A). "'[W]ork which exists in the national economy' means work which exists in significant numbers

---

[11]The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work; and (5) if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920 (a)(4)(i)-(v).

either in the region where such individual lives or in several regions of the country." *Id.*[12]

## DISCUSSION

### A.  Medical Opinion Evidence

DiMauro argues that the ALJ failed to properly weigh the medical opinion evidence. Specifically, he contends that the ALJ misapplied the treating physician rule, because "the opinions from treating orthopedist Dr. Moeckel are based on appropriate clinical and diagnostic testing and are uncontradicted by other substantial evidence in the record. Therefore, Dr. Moeckel's opinions should have been given controlling weight." (Doc. # 13, at 7).

The Commissioner responds that the ALJ properly evaluated the medical opinion evidence. Specifically, she argues that "the ALJ fulfilled the Commissioner's regulatory responsibility by giving good reason for giving Dr. Moeckel's assessments little weight." (Doc. # 14, at 4). These good reasons, according to the Commissioner, were that Dr. Moeckel's opinions were "not supported by an explanation and not consistent with the record as a whole." (*Id.*).

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). On the other hand, "the opinion of the treating physician is not

---

[12]The determination of whether such work exists in the national economy is made without regard to: (1) "whether such work exists in the immediate area in which [the claimant] lives"; (2) "whether a specific job vacancy exists for [the claimant]"; or (3) "whether [the claimant] would be hired if he applied for work." 42 U.S.C. § 423 (d)(2)(A).

afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam). Here there are opinions of other medical experts, i.e., the state agency physicians, that are not consistent with Dr. Moeckel's opinions. For that reason, the Court finds no error in the ALJ's decision not to afford controlling weight to Dr. Moeckel's opinions.

The conclusion that Dr. Moeckel's opinions were not entitled to controlling weight does not end the inquiry into the ALJ's treatment of the medical opinion evidence: "[E]ven if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Shrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009). "To override the opinion of the treating physician, we have held that the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks and alterations omitted). The governing regulations require the Commissioner to "always give good reasons in our . . . decision for the weight we give your treating source's medical opinion." 20 C.F.R. § 404.1527 (c)(2). Accordingly, "[t]he failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek*, 802 F.3d at 375 (internal quotation marks omitted).

With regard to the opinion of Dr. Khan, one of the state agency consulting physicians, the regulations provide as follows with regard to how the medical opinions of nonexamining

physicians are considered for purposes of determining whether a claimant is disabled:

> because nonexamining sources have no examining or treating
> relationship with you, the weight we will give their medical opinions
> will depend on the degree to which they provide supporting
> explanations for their medical opinions. We will evaluate the degree
> to which these medical opinions consider all of the pertinent evidence
> in your claim, including medical opinions of treating and other
> examining sources.

20 C.F.R. § 404.1527 (c)(3).

On the basis of the rationale articulated in the ALJ's April 23, 2015 decision, the Court

cannot conclude that the ALJ properly evaluated the medical opinion evidence that was before

him. The Court is particularly concerned with the ALJ's reliance on the opinion of Dr. Khan and

how that reliance affected the decision to give little weight to the opinions of Dr. Moeckel. The

entirety of the ALJ's discussion of Dr. Khan's opinion is as follows:

> Lastly, great weight is given to the June 16, 2014 opinion of Khurshid
> Kahn [sic] M.D., a Disability Determination Services medical
> consultant, who opined that the claimant could do a range of
> medium work within 12 months of onset. Counsel argued this
> opinion was based on anticipated improvement after one year,
> which did not occur. The residual functional capacity has been
> reduced to light to account for the claimant's slower than
> anticipated improvement.

(Doc. # 9-3, at 34, p. 33). While the ALJ states that he gave great weight to the opinion of Dr.

Khan, he did not indicate any reason why he gave great weight to that opinion. To override the

opinion of a treating physician, the ALJ must consider, among other factors, "whether the

physician is a specialist." *Greek*, 802 F.3d at 375. As an orthopedic surgeon, Dr. Moeckel clearly

was a specialist in a field related to the severe impairments the ALJ found applicable to

DiMauro's applications for benefits. The ALJ's decision refers to Dr. Khan solely as "a

-17-

Disability Determination Services medical consultant." (Doc. # 9-3, at 34, p. 33). The Court recognizes that state agency medical consultants are considered to be "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a (b)(1). At the same time, however, the parties' joint stipulation of facts refers to Dr. Khan as a pulmonologist[13], which is a specialty field not related to DiMauro's severe impairments of degenerative disc disease and peripheral neuropathy/epicondylitis. In light of these facts, the Court currently is unable to conclude that the ALJ explicitly considered all of the factors enumerated in *Greek* in connection with his determination to give little weight to the opinions of Dr. Moeckel.

The weight given to the opinion of a nonexamining source, such as Dr. Khan, depends in part on "the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other sources." 20 C.F.R. § 404.1527 (c)(3). As previously noted, Dr. Khan's June 2014 opinions and conclusions are a mirror image of those expressed by Dr. Mogul in February 2014.  Both state agency physicians identified the 2013 MRIs of DiMauro's cervical and lumbar spine and Dr. Moeckel's treatment note regarding DiMauro's visit on November 7, 2013 as the  specific facts upon which they based their conclusions. These three pieces of evidence do not constitute all of the pertinent evidence regarding DiMauro's claim. Additionally, both the February 2014 and June 2014 disability determination reports stated that "[t]here is no indication that there is medical or other opinion evidence." (Doc. # 9-4, at 9, p. 99, and at 38, p. 128). Dr. Moeckel completed his initial Summary Impairment Questionnaire concerning DiMauro on September 25, 2013, well before

---

[13]"Pulmonology is an area of medicine that focuses on the health of the respiratory system."  http://www.healthline.com/health/what-is-a-pulmonologist#Overview1 (last visited March 17 2017).

-18-

Dr. Khan offered his opinion in June 2014. Dr. Moeckel's September 25, 2013 Questionnaire included medical opinions of a treating source which were not considered by Dr. Khan. Under these circumstances, the Court must conclude that the ALJ failed "to provide good reasons for not crediting the opinion of a claimant's treating physician," which "is a ground for remand." *Greek*, 802 F.3d at 375.

Because the Court cannot conclude that the ALJ properly evaluated the medical opinion evidence that was before him, this matter must be remanded so that the ALJ may apply explicitly the factors enumerated in *Greek* and, should the ALJ decide not to credit the opinions of Dr. Moeckel, provide the required good reasons for not crediting those opinions.

## B.  Credibility - Pain Symptoms

DiMauro also argues that the ALJ failed to properly evaluate his credibility. Specifically, he contends that the ALJ's credibility determination "is not supported by substantial evidence." (Doc. # 13, at 9). The Commissioner responds that the ALJ's finding with respect to DiMauro's credibility was proper and is supported by substantial evidence in the record.

In evaluating a claimant's subjective complaints of symptoms and the limiting effects of those symptoms, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical

-19-

> sources during the course of examination or treatment, or
> to the agency during interviews, on applications, in letters,
> and in testimony in its administrative proceedings.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks, citations and

alterations omitted).

The ALJ "is not required to accept the claimant's subjective complaints without question;

he may exercise discretion in weighing the credibility of the claimant's testimony in light of the

other evidence in the record." *Id.* At the same time, however, "[a] finding that the witness is not

credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary

review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988).

With regard to the first step, the ALJ found that "the claimant's medically determinable

impairment could reasonably be expected to cause the alleged symptoms . . . ." (Doc. # 9-3, at

30, p. 29). As to the second step, however, he found that "the claimant's statements concerning

the intensity, persistence and limiting effects of these symptoms are not entirely credible for the

reasons explained in this decision." (*Id.*). The ALJ further explained his reasoning regarding

DiMauro's credibility as follows:

> The claimant's alleged degree of pain and functional limitation
> are disproportionate to the objective medical evidence. The
> claimant has denied performing essentially all activities, yet
> he was able to work part-time in a lighter position. Moreover,
> the claimant testified to doing nothing around his house. When
> questioned about the March 10, 2014 note of Dr. Kapoor's that
> he injured his back replacing parts on the ventilation unit above
> the range, the claimant testified that a neighbor actually did the
> repairs and he just watched; however, the claimant's allegation
> is not supported by the detailed account contained in Dr. Kapoor's
> treatment notes that the claimant was twisting in an unusual
> position and began to feel sharp pain when he stood up straight.
> Additional evidence that the claimant has a greater functional

> capacity than alleged is the March 6, 2014 treatment report that
> the claimant alleged experiencing increased pain after clearing
> snow.

(*Id.* at 33, p. 32).

While evidence of DiMauro's part-time work and other activities may not foreclose the possibility of his being disabled under the Social Security laws, such evidence can be considered for purposes of assessing his credibility. *See Durante v. Colvin*, Civ. No. 3:13CV1298 (HBF), 2014 U.S. Dist. LEXIS 142053, at *52 (D. Conn. Aug. 6, 2014) (internal quotation marks omitted) ("an ALJ's consideration of a claimant's part-time work is entirely proper and may support an ALJ's decision to discount a claimant's credibility"). "Similarly, a claimant's daily activities are properly considered when evaluating credibility." *Id.* at *54.

DiMauro also argues that the ALJ's credibility determination is not supported by substantial evidence because the ALJ improperly substituted his lay interpretation of DiMauro's MRIs for that of his treating physician Dr. Moeckel. The Commissioner responds that the ALJ did not substitute his judgment for that of Dr. Moeckel, but instead relied upon the judgment of the state agency physician Dr. Khan. The Court has already addressed the issues it finds with the ALJ's reliance on Dr. Khan's opinion. With respect to the MRIs, however, the Court finds that the ALJ's decision merely reflects the impressions of the physician who interpreted the MRIs that were ordered by Dr. Moeckel. As to the cervical spine MRI the doctor's impression was "[m]ild degenerative changes of the cervical spine . . . ." (Doc. # 9-8, at 13, p. 377). As to the lumbar spine, the doctor's impression was "[s]table mild degenerative changes of the lumbar spine." (*Id.* at 15, p. 379). The recitation of those impressions by the ALJ does not suggest that he erred in his assessment of DiMauro's credibility

The Court finds that the ALJ did properly evaluate DiMauro's credibility.  As noted earlier in this ruling, in the absence of legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. With specific reference to credibility determinations, the Second Circuit has stated that "[c]redibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Pietrunti v. Director, Office of Workers' Compensation Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted). In light of the evidence that was before the ALJ, the Court cannot say that his findings as to DiMauro's credibility are patently unreasonable. Consequently, this Court must defer to those findings and conclude that the ALJ's credibility determination is supported by substantial evidence. Therefore, DiMauro's motion to reverse on this ground is denied and the Commissioner's motion to affirm on this ground is granted.

CONCLUSION

For the reasons stated above, DiMauro's motion to reverse or remand (**doc. # 12**) is **GRANTED in part** and  **DENIED in part** and the Commissioner's motion to affirm (**doc. # 14**) is **GRANTED in part** and **DENIED in part**.

This matter is remanded to the Commissioner for further proceedings consistent with this decision.

The Clerk is directed to enter judgment and  close this case.

SO ORDERED this   23rd   day of March,  2017.

_____
            /s/ DJS
                  Dominic J. Squatrito
                  United States District Judge